## GRECO CANNING CO. v. P. PASTENE & CO., Inc.

(Circuit Court of Appeals, Ninth Circuit. January 9, 1922. Rehearing Denied February 20, 1922.)

No. 3750.

1. **Sales ⇐69—Contract held one for sale by canning company of its own product.**

A contract for the sale of 4,000 cases of Salsa de Pomidoro. a product not theretofore produced in the United States, which provided that quality was to be of the same consistency as the imported, of good flavor and color, and that samples were to be submitted for approval prior to shipping, and shipment to correspond with samples, and that in case of short pack the seller agreed to make pro rata delivery only, *held* a contract for the pack of the seller's own cannery, especially in view of the evidence.

2. **Sales ⇐172—Seller not liable for nondelivery under provision relieving it in case of causes beyond its control.**

Under a contract for the sale of Salsa de Pomidoro, providing that in case of short pack the seller would only make pro rata delivery, and that, if unable to perform by reason of a strike, fire, or other circumstances beyond its control, its obligation should cease, where the parties knew that special machinery would be necessary, and it appeared that the seller's failure to make delivery was entirely due to defects in the machinery, which it exerted itself in good faith to overcome, the seller, having delivered the buyer's pro rata share of its pack, was not liable, especially where the buyer, on learning of the difficulty experienced with the machinery, stated that, if the seller would make every effort to produce the goods, "we will surely meet you in reasonable fashion in considering the unfortunate condition which has confronted you."

In Error to the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Action by P. Pastene & Co., Incorporated, against the Greco Canning Company. Judgment for plaintiff (268 Fed. 168), and defendant brings error. Reversed and remanded, with directions.

The contract for the alleged breach of which this action was brought is as follows:

"The Greco Canning Co., of San Jose, California, hereinafter called seller, this day sold, and P. Pastene & Co., New York City, N. Y., hereinafter called buyer, this day bought, the following described goods—1916 pack:

(2,000) two thousand cases Salsa de Pomidoro packed 200 tins to the case

(2,000) `"` `"` `"` `"` `"` `"` `"` `"` 100 `"` `"` `"` `"` six oz. each, in wooden cases at three dollars and fifty cents ($3.50) per `"` `"` `"` `"` fibre `"` `"` `"` `"` `"` `"` `"` `"` `"` `"` hundred tins. `..` `..`

"Terms.—The above-named goods are f. o. b. cars San Francisco less 1½ per cent. cash discount, sight draft bill of lading attached.

"Guaranty.—Buyers guarantee full acceptance unless this contract is otherwise changed by mutual consent of both seller and buyer. Seller guarantees that the goods covered by this contract are not adulterated, mislabeled, or misbranded within the meaning of the National Food and Drug Act June

⇐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

30, 1906 (Comp. St. §§ 8717–8728), or the California Pure Food Act March 11, 1907 (St. 1907, p. 208). Seller is relieved from any responsibility for misbranding when goods are not shipped under seller's label. Quality to be of same consistency as the imported, of good flavor and color. Samples for approval to be submitted prior to shipping and shipment to correspond with samples.

"Conditions.—Goods at risk of buyer from and after shipment, although shipped to seller's order. In case of short pack, seller agrees to make prorate delivery only. If seller should be unable to perform all its obligations under this contract by reason of a strike, fire, or other circumstances, beyond its control, such obligations shall at once terminate and cease. Usual swell guarantee—viz.: Seller guarantees swells not to exceed one-half of 1 per cent.

"Shipment to be made as soon as practical after packing. All goods remaining unshipped to be billed and paid for not later than November 1, 1916. Buyer agrees to protect draft against documents for invoice value on presentation. Seller agrees to store said goods and insure them at buyer's expense, should buyer so desire, until December 1, 1916.

"Seller: Greco Canning Co.,
"By V. V. Greco, Sec. & Treas.
"Buyer: P. Pastene & Co.,
"By Chas. A. Pastene, Pres.
"Sweet Basil or Basilico.

"One leaf of fresh basil to be put in each tin, either on top or bottom of contents."

The plaintiff in error delivered to the buyer 665 cases of the 4,000 (subsequently reduced to 3,000) cases so contracted for, and set up in defense of the action that they were slightly more than the pro rata to which the buyer was entitled, and that a "short pack" and unavoidable trouble with the necessary machinery, which both parties to the contract knew the seller was to procure, prevented the plaintiff in error from delivering to the buyer any more than 665 cases.

A jury was waived by the respective parties, and while the court below, in deciding the case, made no specific findings of fact, it appears from its opinion that it held that the seller was justified in failing to deliver 20 per cent. of the cases contracted for by reason of a "short crop" in 1916, and, the parties having stipulated that the market price of the product covered by the contract at the time and place of delivery was $10 a case, gave the plaintiff judgment for $5,205 (being at the rate of $3 a case for the deficiency), besides costs of suit.

John L. McNab, of San Francisco, Cal., C. C. Coolidge, of San Jose, Cal., and Byron Coleman and Theodore A. Bell, both of San Francisco, Cal., for plaintiff in error.

William Thomas, Louis S. Beedy, and James Lanagan, all of San Francisco, Cal., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). Passing the contention of the plaintiff in error that the term "short pack," used in the contract, is more comprehensive than the term "short crop," considered by the trial court, we are of the opinion that the provision of the contract to the effect that the seller should be relieved of his obligations thereunder in the event that the performance thereof be prevented by "a strike, fire, or other circumstances beyond his control," protected the plaintiff in error from the liability imposed by the judgment complained of.

[1] It is admitted that Salsa de Pomidoro, while a well-known product of Italy, had never, prior to the making of the contract in question, been produced in the United States. The evidence shows very clearly that both parties to the contract well knew that, for the manufacture of the specific article contracted for, the procuring of special machinery by the seller was essential, and the contract expressly declared that the quality of the article to be manufactured thereunder should be of the same consistency as the imported article, should be of good flavor and color, and that samples thereof should be submitted by the seller for the approval of the buyer prior to any shipment (required to be made as soon as practicable after packing), and that the shipment when made should conform to such sample.

It is, we think, clear from the contract itself, that it was for the pack of the seller's own cannery that the parties were contracting; but, if there could be any doubt about that, it is at once removed by the evidence in the case. Pastene, in speaking in his deposition of the article contracted for, said:

"It was an article which prior to the war to my knowledge had never been manufactured in this country. As a result of the abnormal conditions, the exportation from Italy was curtailed, embargoes were placed from time to time, until ultimately the exportation was entirely prohibited. As a result of this, domestic canners of tomatoes principally interested themselves in imitating the article, or manufacturing it here from the American tomato. However, this necessitated, of course, the installation of new machinery, new arrangements, so that it was not possible to produce any quantities to take care of the entire demand and consumption of the people who were accustomed to using this product."

And in a letter written to the defendant to the action, of date May 8, 1916, the plaintiff said among other things:

"We beg to acknowledge receipt of your communication of April 28th, contents of which had our careful attention. We found inclosed the contracts to which you refer, and we have filled same in for 3,000 cases, and are returning them to you for your approval and signature, asking you to send us, of course, one copy for our files. You will notice that we have inserted in a couple of places additional words to clear the meaning of what we had no doubt was exactly your intent in said contract, but we thought that possibly it would be best for all concerned to have the matter clearly stipulated. The first is in reference to the approval of sample. Naturally, in view of the fact that you have never made any of this article, and therefore we have no means of knowing what you will put up, it is essential that we have an opportunity to pass judgment on the type of article you will manufacture by having sample tins sent for approval or rejection. * * *

"Basilico.—We will want a leaf in each tin and have added that on to the contract.

"Shipping Cases.—We decided to have a part of them come in fibre cases and a part in wooden cases, this to find out how the fibre cases would go as being a new style package, we cannot tell offhand. * * *"

We do not find in the record any substantial conflict with the following testimony of the witness Victor V. Greco:

"I am the Greco whose name is signed to the contract sued on in this case. I personally met Mr. Pastene, manager of the Pastene Company. He visited my plant prior to signing the contract. We went through the plant together. At the time of signing the contract, or prior to signing the contract, he had gone entirely through my plant. Prior to 1916 I had not pro-

duced any such product known as Salsa de Pomidoro. Salsa de Pomidoro is a highly concentrated tomato. Prior to 1916 it had not been a domestic product in the United States of America, but had been imported from Italy. It is a substitute for tomatoes, used principally by Italians in the making of sauces, gravies, and soups. Prior to 1916 we had not produced such a product commercially, nor had it been produced commercially to my knowledge anywhere in the United States. The war was responsible for the commencement of the product in 1916 by the trade. There was an embargo placed on the exportation of that product by Italy, and therefore none came to America. This was the subject of discussion between Pastene and myself before the contract was signed. After signing the contract, I took steps to fulfill it. I contracted for the necessary equipment and machinery, and apparatus for the manufacture of this product. During the year 1916 the peeled tomato and hot sauce departments of our canning plant were operated during the daytime, while the Salsa de Pomidoro department was operated day and night. We would have made more profit out of the Salsa de Pomidoro. It was to our interest to run the Salsa de Pomidor plant at full capacity. * * * We procured this machinery from the Oscar Krenz Manufacturing Company. I do not know of any other firm in America engaged in the manufacture of such machinery. The fact that we would require to install machinery for the purpose of manufacturing this product, this special product, was discussed between Mr. Pastene and myself. The capacity of the machinery was figured out during a season of about two months that we should have produced about 30,000 cases; 30,000 cases would have more than supplied the contracts we had signed. The total amount which we had contracted to deliver to our various customers was 18,930. These were future contracts; and the total capacity of the machinery which we had purchased for the purpose of delivering that was 30,000 cases for the season. We had a margin of something like 12,000 cases to go on. The actual quantity produced by us by running night and day with our machinery was 3,445 cases. Prorating our deliveries, the percentage which we were bound to deliver to each one of those customers was 18.2 per cent. We actually delivered 665 cases to the plaintiff out of 3,445 cases produced by us for the year. The percentage of the pack that we actually delivered to the plaintiff was 22.2 per cent."

[2] There is no substantial conflict in the testimony showing that the Greco Company's failure to deliver to the Pastene Company the number of cases contracted for was entirely due to the defects in the machinery which it exerted itself in good faith to overcome, working both day and night to that end, but without success. Both of these parties, as has been said, knew that the article in question had never been produced in this country, and that new machinery was essential to its manufacture, and they contracted with reference to that fact. The case of Carnegie Steel Co. v. United States, 240 U. S. 156, 36 Sup. Ct. 342, 60 L. Ed. 576, is therefore not in point.

The record further shows that, almost immediately after commencing the pack in question, the defendant to the action notified the plaintiff by letters of the difficulties experienced with the machinery, and of the indication that it would not be able to make a delivery of over 25 per cent., to one of which letters the plaintiff replied as follows:

"We regret exceedingly to learn of the serious difficulty you are experiencing with machinery, owing to the fact that the tube system in your vacuum pans is wrong. Certainly your advice that you cannot now estimate on making more than a 25 per cent. delivery is a severe disappointment. We certainly trust you will find that you have been overconservative in making this estimate, and that it will be possible for you to make considerable larger delivery than this statement would now indicate. At this time we will

only state that if you make every possible effort to produce these goods within your power, as we doubt not you are doing, we will surely meet you in reasonable fashion in considering the unfortunate condition which has confronted you. It is obvious, naturally, of course, that in any case we shall expect a full pro rata delivery of all such goods as you are successful in producing."

And in a subsequent letter the plaintiff in the case, in answer to a letter from the defendant thereto, to the effect that it was doubtful whether the latter would be able to make more than a 20 per cent. delivery, said, among other things:

"Pro Rata.—We understand that weather conditions have greatly improved during the last ten days in your country and that a long packing season is anticipated. We surely trust that these predictions may not miscarry, as in that case we are confident that you will find it possible to considerably increase the production which you previously estimated as possible. As previously written you, we certainly have no intention of being unreasonable or expecting from you that which it is physically impossible for you to accomplish, but we do expect, of course, that you will spare no efforts to, as nearly as possible, fill your contracts, and it is for this reason that, knowing that conditions have materially improved since you previously wrote us on this subject, we look forward to a better delivery than previously predicted. Knowing that you will not spare any reasonable efforts to attain the desired result, we look forward in anticipation to your more favorable news as mentioned."

Other correspondence between the respective parties occurred and is set out in the record, and differences and feeling between them evidently arose, all of which we have considered but do not think it necessary to lengthen this opinion by setting it out.

After careful consideration, we are of the opinion that the judgment should be reversed, and the cause remanded to the court below, with directions to enter judgment for the defendant, with costs.

Ordered accordingly.

GILBERT, Circuit Judge (concurring). Passing by the question of the meaning of the words "short pack" and "strike, fire, or other circumstances beyond its control," I think that the defendant is absolved from the payment of damages by the evidence which shows the construction which the parties to the contract placed upon it, and the plaintiff's waiver of performance. On October 25, 1916, the plaintiff, in answer to a letter of the defendant, in which it had set forth the extreme and serious difficulties which it had experienced in the operation of its machinery, wrote as follows:

"At this time we will only state that if you make every possible effort to produce these goods within your power, as we doubt not you are doing, we will surely meet you in reasonable fashion in considering the unfortunate condition which has confronted you. It is obvious, naturally, of course, that in any case we shall expect a full pro rata delivery of all such goods as you are successful in producing."

Here is a distinct promise to meet in "reasonable fashion" the failure of the defendant to produce the goods, provided that it exercised every possible effort to produce them. From the evidence there can

277 F.—56

be no doubt that the defendant did exercise every possible effort, and the fair meaning of the promise to meet this failure in reasonable fashion is that the plaintiff agreed to meet such effort by excusing full performance. Certainly that was a reasonable view for the plaintiff to take of the obligations of the contract, in view of its terms and the circumstances which made full performance impossible, and if the words have not that meaning they are meaningless.

Again, on November 7, 1916, the plaintiff wrote:

"As previously written you, we certainly have no intention of being unreasonable, or expecting from you that which is physically impossible for you to accomplish, but we do expect, of course, that you will spare no efforts to, as nearly as possible, fill your contracts."

The declaration that the plaintiff did not expect from the defendant that which was physically impossible for it to accomplish is to be taken in the light of the information which it had received from the defendant concerning the nature of the difficulties which in the defendant's view made full performance impossible.